ORIGINAL

FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 SEP -2 AM 9:45

U.S. DISTRICT COURT
N.D. OF ALABAMA

SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
) Civil Action No.
vs. )
CV-03-AR-2424-S
MICHAEL MARTIN and )
MALCOLM E. MCVAY )
)
Defendants. )
)

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Securities and Exchange Commission ("Commission") files this Complaint for Injunctive and Other Relief and alleges as follows:

### INTRODUCTION

1. Since at least 1997, HealthSouth Corporation ("HRC"), one of the nation's largest healthcare providers, has overstated its earnings by at least $2.6 billion. This massive overstatement occurred because HRC's founder, chief executive officer ("CEO") and chairman of the board, Richard M. Scrushy ("Scrushy"), insisted that HRC meet or exceed earnings expectations established by Wall Street analysts.

2. When HRC's earnings fell short of such estimates, Scrushy directed HRC's accounting personnel, including Michael Martin, to "fix it" by artificially inflating the company's earnings to match Wall Street expectations. To balance HRC's books, the false increases in earnings were matched by false increases in HRC's assets. By the third quarter of 2002, HRC's assets were overstated by at least $800 million, or approximately 12 percent of total assets.

3.    Defendant Michael Martin began working for HRC in 1989 and served as HRC's chief financial officer ("CFO") from October 1997 until he resigned from the company in March 2000.

4.    Defendant Malcolm E. McVay was employed by HRC in September 1999 and became CFO in August 2002.

5.    At the direction of senior officers, including Martin from October 1997 until March 2000, HRC employees with responsibility for various accounts, made or directed the fraudulent adjustments in HRC's financial records necessary to inflate artificially HRC's earnings.

6.    Martin signed many of HRC's public filings with the Commission during that period, while knowing that they contained false and misleading statements.

7.    In November 2002, McVay signed a false certification that the financial statements contained in the Form 10-Q for the period ended September 30, 2002, were accurate and fairly presented, when in fact he knew that they were materially false.

8.    Defendant Martin has engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and acts and practices that aid and abet HRC's violations Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)], and Rules

10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

9. Defendant McVay has engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 and 13a-14 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14] and acts and practices that aid and abet HRC's violations of Sections 10(b) and 13(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(a)] and Rules 10b-5, 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-13].

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to Sections 20(b), 20(d) and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77t(e)] and Sections 21(d), 21(e) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78u-1] to enjoin the defendants from engaging in transactions, acts, practices and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for an officer and director bar, disgorgement of ill-gotten gains and prejudgment interest, other equitable relief, and for civil money penalties.

11. This Court has jurisdiction of this action pursuant to Sections 20(b), 20(d), 20(e) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

12. The defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the

means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

13.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendants reside within this district.

## THE DEFENDANTS

14.     Michael Martin, age 41, was HRC's CFO from 1997 until approximately September 2000 when he resigned. Martin began his employment with HRC in 1989 as Vice President and Treasurer.

15.     Macolm E. McVay, age 41, became HRC's CFO in August 2002. He had been HRC's Executive Vice President and Treasurer since approximately September 2001 and Senior Vice President and Treasurer since September 2000. McVay was hired by HRC in September 1999.

## OTHERS INVOLVED

16.     HealthSouth Corporation was incorporated in Delaware in 1984 and is headquartered in Birmingham, Alabama. HRC is the nation's largest provider of outpatient surgery, diagnostic and rehabilitative healthcare services. It owns or operates approximately 1,800 different facilities throughout the United States and abroad, including inpatient and outpatient rehabilitation facilities, outpatient surgery centers, diagnostic centers, medical centers and other healthcare facilities.

17.     HRC's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act. For the year ended December 31, 2001, HRC reported total revenues

of $4 billion and net income of $76 million. HRC's stock was listed on the New York Stock Exchange ("NYSE") and was actively traded under the symbol of "HRC."

18.   Richard M. Scrushy, age 49, founded HRC and served as its Chairman since 1994. He served as HRC's CEO from 1994 until August 27, 2002. On January 6, 2003, he reassumed the position of HRC's CEO. Shortly after HRC went public in 1986, Scrushy instructed HRC's senior officers and accounting personnel to materially inflate HRC's earnings to match Wall Street analysts' expectations.

19.   HRC and Scrushy are defendants in a related matter, SEC v. HealthSouth Corp. and Richard M. Scrushy, Case No. CV-03-J-0615-S, which was filed in this Court on March 19, 2003.

## THE SCHEME TO OVERSTATE EARNINGS

20.   Shortly after HRC became publicly traded in 1986, and at Scrushy's instruction, the company began to artificially inflate its earnings to match Wall Street analysts' expectations. Between 1997 and the third quarter of 2002, HRC intentionally overstated its earnings, identified as "Income Before Income Taxes And Minority Interests," by at least $2.6 billion in reports filed with the Commission.

21.   Pursuant to the scheme, on a quarterly basis, HRC's senior accounting personnel presented Scrushy with an analysis of HRC's actual, but as yet unreported, earnings for the quarter as compared to Wall Street's expected earnings for the company.

22.   If HRC's actual results fell short of expectations, Scrushy, HRC's Chief Operating Officer and, from 1997 until September 2000 Martin, provided HRC's accounting staff with the desired earnings per share number and instructed them to "fix it" by recording false earnings in HRC's accounting records to make up the shortfall. It

5

was understood that Scrushy was directing his staff to record false earnings on HRC's accounting records to make up the shortfall.

23. At the direction of Martin and others, HRC's accounting staff then met to discuss ways to inflate artificially HRC's earnings in order to meet the Wall Street earnings expectations.

24. These meetings were known as "family meetings" and the attendees were known as "family members."

25. Most of the fraudulent entries to the income statement consisted of reducing a contra revenue account, called "contractual adjustment," and/or decreasing expenses, (either of which increased earnings).

26. The contractual adjustment account is a revenue allowance account that estimates the difference between the gross amount billed to the patient and the amount that various healthcare insurers will pay for a specific treatment. HRC deducted this account from gross revenues to derive net revenues, which were disclosed on HRC's periodic reports filed with the Commission.

27. From 1997 through around June 2002, senior HRC accounting personnel, including Martin until September 2000, instructed the accounting staff to make entries to HRC's books and records near the end of each quarter that reduced the contractual adjustment account, thereby increasing HRC's revenues. Accounting staff members were given specific amounts by which to reduce this account and were told to allocate that amount among various HRC facilities.

28. Accounting staff members, including Martin, never received supporting documentation for these entries, understood that these entries would result in an increase

to HRC's revenues and knew that the these entries were not proper under Generally Accepted Accounting Principles ("GAAP") and that the entries would be and were reflected in the financial statements that HRC filed with the Commission and would make those statements materially misleading.

29. The "family members" also identified false balance sheet entries to match the false entries to HRC's income statement. The balance sheet entries were necessary because, under GAAP, any increase in revenue or decrease in expenses is generally matched with either an increase in assets or decrease in liabilities. The false balance sheet entries were made to the Property Plant and Equipment ("PP&E") Account; cash account; inventory account; and intangible asset (goodwill) account.

30. The "family members" referred to the difference between actual earnings and Wall Street expectations as "the hole" and the false balance sheet entries that matched false income statement entries as "dirt" that would fill in the "hole" or "gap."

31. Accounting staff members created suffixes for line items within HRC's general ledger balance sheet accounts that received false entries so that HRC's Chief Operating Officer could identify the amounts that particular accounts had been falsified.

32. The scheme to manipulate earnings allowed Scrushy to boast in HRC's 2001 annual report that:

> In 2001 we set new records as we pushed our revenues well over $4.3 billion and celebrated another year of fulfilling Wall Street expectations, <u>maintaining our record as the Fortune 500 company with the second longest streak for meeting or exceeding analysts' expectations</u>.

33. Senior accounting officers instructed HRC's accounting personnel to design the fictitious accounting entries to avoid their detection. For example, if the accounting staff

7

decided to increase inventories, it would increase inventory accounts at various HRC facilities by different false amounts because they knew that if amounts were increased uniformly, the auditors might become suspicious.

34. In addition, since the HRC accounting staff knew that auditors questioned additions to the PP&E account that exceeded a certain threshold, they kept the false additions to the PP&E account at a particular facility below that threshold.

35. Some members of the accounting staff created and caused to be created false documents to be provided to HRC's auditors for the purpose of concealing the massive accounting fraud. For example, the names of fraudulently enhanced PP&E accounts were changed to make the false accounts appear routine.

36. In addition, when the auditors questioned a particular false entry to the assets at one HRC facility, a member of the accounting staff found an invoice to another facility that approximated the dollar amount of the entry questioned by the auditors, altered the invoice to appear to support the entry in question, and gave the altered invoice to the auditors.

37. Martin and others directed the accounting staff to make false and fraudulent journal entries in HRC's books and records as described above, knowing: (1) that such journal entries would ultimately be reflected in HRC's financial statements and public filings with the Commission; and (2) that HRC's financial statements and public filings would falsely overstate HRC's revenue, earnings and earnings per share.

38. As the CFO of HRC, Martin signed HRC's Form 10-K for 1997 and signed all Forms 10-K and 10-Q reports that HRC filed with the Commission through the Form 10-Q for the third quarter of 1999. By signing these reports, Martin caused HRC to file with the

Commission annual reports and quarterly reports that he knew materially misstated, among other things, HRC's net income, revenue, earnings per share, assets, and liabilities.

39. Shortly after becoming HRC's CFO in August 2002, McVay was told that revenue had been materially overstated in prior quarters and that cash was materially overstated on HRC's balance sheet in the financial statements that HRC had previously filed with the Commission. McVay understood that these fraudulent entries had been made to artificially inflate earnings and earnings per share.

40. On or around November 14, 2002, McVay certified that HealthSouth's Form 10-Q for the third quarter ended September 30, 2002, fairly presented, in all material respects, the financial condition and results of operation of HealthSouth. When he signed the certification, McVay knew that HRC's balance sheet materially overstated HRC's assets.

41. While in possession of material non-public information, specifically that HRC's public filings included materially false and misleading statements, Martin exercised HRC options and sold securities of HRC into the public market.

## CLAIMS FOR RELIEF

## COUNT I—FRAUD

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

42. Paragraphs 1 to 41 are hereby realleged and are incorporated herein by reference.

43. Defendant Martin, from at least 1997 through the third quarter of 1999, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

(a) directly and indirectly employed devices, schemes and artifices to defraud purchasers of such securities;

(b) directly and indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading; and

(c) engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

44. Defendant Martin knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud. In engaging in such devices, schemes and artifices to defraud, defendants Martin and McVay acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

45. By reason of the foregoing, defendant Martin, directly and indirectly, have violated and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II--FRAUD

### Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

46. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

47. Defendant Martin, from at least 1997 through the third quarter of 1999, and defendant McVay, during the third quarter of 2002, in connection with the purchase or

sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a)      employed devices, schemes, and artifices to defraud;

    b)      made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c)      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

48.      Defendants Martin and McVay knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, defendants Martin and McVay acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

49.      By reason of the foregoing, defendants Martin and McVay, directly and indirectly, have violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT III-AIDING AND ABETTING ANTIFRAUD VIOLATIONS

**Aiding and Abetting HRC's Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10-b-5]**

50.      Paragraphs 1 through 41 are hereby alleged and are incorporated herein by reference.

51.     Defendant Martin, from at least 1997 through the third quarter of 1999, and defendant McVay, during the third quarter of 2002, aided and abetted violations by HRC of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. HRC's violations occurred when HRC, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

    a)     employed devices, schemes, and artifices to defraud;

    b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c)     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

52.     Defendants Martin and McVay knowingly, intentionally, and/or recklessly provided substantial assistance to the aforementioned fraudulent conduct. While providing such assistance, defendants Martin and McVay acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard of the truth.

53.     By reason of the foregoing, defendants Martin and McVay, directly and indirectly, have aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15. U.S.C.§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV-AIDING AND ABETTING REPORTING PROVISIONS

**Aiding and Abetting HRC's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-13 and 13a-14 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1, 240.13a-13 and 240.13a-14]**

54. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

55. Defendant Martin, from at least 1997 through the third quarter of 1999, aided and abetted HRC's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder. Defendant McVay, during the third quarter of 2002, aided and abetted HRC's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

56. The underlying violations occurred when HRC filed annual and periodic reports that contained financial statements that were not prepared in conformity with GAAP and contained material misstatements. Through the conduct described in the above paragraphs, defendants Martin and McVay knowingly or recklessly substantially assisted HRC's violations of this section and rules.

57. Defendant McVay also violated Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14], when he certified that the financial statements within the Form 10-Q for the quarter ended September 30, 2002, fairly presented, in all material respects, HRC's financial condition and results of operations. McVay signed this certification, knowing that the balance sheet included materially overstated HRC's assets.

58. By reason of the foregoing, defendant Martin, directly and indirectly, has aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 13(a)

of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1 and 240.13a-13].

59.     By reason of the foregoing defendant McVay, directly or indirectly, violated and unless enjoined will continue to violate Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] and aided and abetted violations of, and unless restrained will continue to aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20 and 240.13a-13].

## COUNT V- AIDING AND ABETTING BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Aiding and Abetting HRC's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]

60.     Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

61.     Defendant Martin, from at least 1997 through the third quarter of 1999, aided and abetted HRC's violations of Section 13(b)(2)(A) of the Exchange Act, which occurred when HRC failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of HRC's assets. Through the conduct described in the above paragraphs, Martin knowingly or recklessly substantially assisted HRC's violations of these sections.

62.     Defendant Martin, from at least 1997 through the third quarter of 1999, aided and abetted HRC's violations of Section 13(b)(2)(B) of the Exchange Act, which occurred when HRC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions were executed in accordance with management's general or specific authorization; (b) transactions were

recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability of assets; (c) access to assets was permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Through the conduct described in the above paragraphs, defendant Martin knowingly or recklessly substantially assisted HRC's violations of this section.

63.  By reason of the foregoing, defendant Martin, directly and indirectly, have aided and abetted, and unless enjoined will continue to aid and abet, violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### COUNT VI - BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder

64.  Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

65.  Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account required by Section 13(b)(2)(A) of the Exchange Act. Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing the falsification of any such books, records or accounts.

15

66. Through the conduct described above, defendant Martin, directly and indirectly, violated and unless enjoined will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue a permanent injunction enjoining defendant Martin and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

    a.    from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    b.    from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

    c.    from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1];

    d.    from aiding and abetting violations Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

III.

Issue a permanent injunction enjoining defendant McVay and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

    a.    from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

    b.    from violating Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]; and

    c.    from aiding and abetting violations Sections 10(b) and 13(a) of the Exchange Act and Rules 10b-5, 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-13].

IV.

Issue an Order requiring defendants Martin and McVay to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

V.

Issue an Order requiring defendants Martin and McVay, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Sections 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 21A of the Exchange Act for Martin, to pay civil monetary penalties.

VI.

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] prohibiting defendants Martin and McVay from acting as an officer or director of any issuer that has a class of

securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C.§ 78o(d)].

VII.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as may be necessary and appropriate.

Dated: August 29, 2003                    RESPECTFULLY SUBMITTED,

William P. Hicks
DISTRICT TRIAL COUNSEL
Ga. Bar No. 351649
Tel: 404 842-7675

M. Graham Loomis
SENIOR TRIAL COUNSEL
Ga. Bar No. 457868
Tel: 404 842-7622

Alex Rue
SENIOR TRIAL COUNSEL
Ga. Bar No. 618950
Tel: 404 842-7616

COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1234
(404) 842-7600
(404) 842-7679 fax